# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| **TAMMY HICKS** | § | |
| **v.** | § | **NO. 5:14cv70** |
| **COMMISSIONER, SOCIAL SECURITY** | § | |
| **ADMINISTRATION** | | |

### MEMORANDUM OPINION AND ORDER OF DISMISSAL

Tammy Hicks ("Plaintiff") initiated this civil action pursuant to the Social Security Act ("The Act"), Section 405(g) for judicial review of the Commissioner's denial of Plaintiff's applications for Social Security benefits. On July 24, 2014, the case was assigned to the undersigned for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and the consent of the parties. The Court is of the opinion the above-entitled Social Security action should be **AFFIRMED**.

### HISTORY OF THE CASE

On September 1, 2011, Plaintiff protectively filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"), alleging a disability onset date of May 8, 2011, but later amended to September 1, 2011 (Tr. 871). Plaintiff's application alleges disability due to carpal tunnel syndrome, a "frozen shoulder," and "left arm screws." (Tr. 871, 979-988, 1000). On appeal, Plaintiff asserts she also suffers from irritable bowel syndrome ("IBS") and chronic acute gastritis.

Plaintiff's claims were denied initially and upon reconsideration. A hearing was held in this matter on January 9, 2013 (Tr. 888-913). On February 6, 2013, an Administrative Law Judge ("ALJ") issued an unfavorable decision (Tr. 868-886). Plaintiff requested the Appeals Council review the decision. On March 27, 2014, the Appeals Council denied the request (Tr. 1-6). Plaintiff now seeks judicial review in this Court.

## STATEMENT OF THE FACTS

Plaintiff was born April 8, 1969 and was forty-two years old at the time of the alleged onset date (Tr. 893). Plaintiff did not have a high school education and did not complete the eleventh grade (Tr. 894). Furthermore, Plaintiff did not have any vocational training or trade schooling (Tr. 894). Plaintiff had past relevant work as an outside sales person for a telephone company (Tr. 895).

On June 11, 2010 Plaintiff received x-rays from Dr. McMillan of her shoulder and scapula after she fell off a horse (Tr. 1897). Dr. McMillan found a suspected acute fracture of the superior lateral aspect of the humeral head with small fracture fragments in Plaintiff's shoulder but was unable to obtain an axillary lateral or scapular Y-view because of Plaintiff's shoulder pain. Plaintiff's scapula appeared intact with no fracture identified and no abnormalities noted. No dislocation of her shoulder joint was expected (Tr. 1898).

Plaintiff saw Dr. Alkire on July 7, 2010, complaining of pain in her arm (Tr. 1786). Plaintiff stated she had been doing fairly well at home, but had a decreased range of motion in her right shoulder. She was unable to afford physical therapy but had been taught how to do some exercises. However, the pain and discomfort had recently increased in her shoulder. Plaintiff had recently visited the emergency room following a "spat" with her husband which resulted in additional injuries to her shoulder. Dr. Alkire noted emotional distress from Plaintiff after she began to cry when describing the incident with her husband.

Plaintiff's physical examination was largely normal with no issues found other than in her extremities (Tr. 1787). Her right shoulder showed forward flexion at approximately ninety degrees, abduction at ninety degrees, and limited external rotation with pain upon forward flexion and internal rotation. Plaintiff's left wrist showed a healed carpel from a previous open reduction internal fixation, dorsiflexion of approximately forty degrees, and a palmar flexion of forty degrees. She was unable to make a fist. The x-rays of her shoulder showed glenohumeral joint reduction, a fracture in the tuberosity, and a callus formation in the superior aspect of the humeral head. Dr. Alkire concluded Plaintiff's shoulder looked "pretty good" overall (Tr. 1787).

On October 4, 2010 Plaintiff saw Dr. Alkire complaining of a stiff right shoulder. She stated her wrist was "okay" and usable (Tr. 1602). She could make a fist and had a palmar flexion of about seventy percent as well as a dorsiflexion of seventy percent passively. Her shoulder had a ninety percent forward flexion and abduction both passively and actively and her external rotation was approximately forty percent. X-rays of her right shoulder showed a healed greater tuberosity fracture with some calcification. However, Dr. Alkire also noted Plaintiff still had some significant arthrofibrosis of the right shoulder. He recommended she undergo right shoulder manipulation under anesthesia and receive more physical therapy. Plaintiff stated she did not have the funds for the operation at the time. Dr. Alkire prescribed her more pain medication to take sparingly and scheduled a follow-up exam in six weeks.

Plaintiff called Dr. Alkire on October 7, 2010 complaining of constant pain which prevented her from doing housework. She requested more pain medication, but Dr. Alkire informed Plaintiff the medication she was currently taking was too much for her already and refused to prescribe any more. (Tr. 1602).

Plaintiff had a cervical spine MRI taken on November 1, 2011 by Dr. McMillan, who compared the results to another MRI scan of the cervical spine taken on November 8, 2006. Dr. McMillan found there was minimal central disc protrusion suggested at C2-3, C3-4, and C4-5 without spinal stenosis, lateral recess narrowing, or foraminal narrowing. The cervical disc levels were otherwise unremarkable; they were normal in contour and alignment, there was no abnormal marrow signal, and the visualized portions of the spinal cord was normal in signal (Tr. 1899).

Plaintiff returned to Dr. Alkire for her check-up on February 15, 2011 complaining of pain in her hand and wrist as well as occasional discomfort in her hips and knees. Dr. Alkire noted a scar on plaintiff's left wrist but no deformities. Dr. Alkire also observed Plaintiff had slight tenderness to palpation over the radial styloid and slight tenderness to palpation over the little finger DIP and PIP joint with no synovitis. Dr. Alkire prescribed Ultram 50mg for Plaintiff's pain and sent her for further tests due to her family history of MCTD [mixed connective tissue disease]. (Tr. 1602).

Plaintiff returned to Dr. Alkire for follow-up on April 21, 2011. She complained of increasing discomfort in her left hand, stating it felt cold, numb, and tingly. Dr. Alkire noted Plaintiff could make a full fist and had full extension of the fingers and thumb with no thenar atrophy, but she was positive for both Tinel's and Phalen's on her left side. An x-ray of her wrist proved normal, but Dr. Alkire noted she may have carpel tunnel syndrome (Tr. 1601).

Plaintiff returned to Dr. Alkire on September 12, 2011 after going to the emergency room three days earlier. She stated she had intense pain in her shoulder which spread across her upper back and face. Plaintiff alleged the pain traveled up both sides of her neck into her face and eye, and she did not believe it was a migraine. Dr. Alkire noted Plaintiff's right shoulder showed full active and passive ROM, and she had minimal pain with forward flexion or internal rotation. X-rays of the right shoulder showed a healed fracture with some calcification, and x-rays of her cervical spine taken at the emergency room showed no fracture or dislocation but only a small amount of loss of normal cervical lordosis. Dr. Alkire found no obvious pathology in her chest or lungs. He referred Plaintiff to a neurologist in order to find out if she had a migraine. Dr. Alkine also ordered an MRI of the right shoulder to determine if she had an intrinsic pathology to her shoulder (Tr. 1601).

On December 1, 2011, Plaintiff completed the function report for the SSA (Tr. 1027-1034). She complained of severe pain, numbness in her arms and legs, head and neck pain, and episodes of passing out and blacking out. Plaintiff stated she seldom cooked, and was infrequently capable of washing and drying clothes. Furthermore, Plaintiff stated there were days where she would be unable to do anything "except lay down or sit in a recliner." Plaintiff claimed she only slept two hours a night due to pain in her neck, back, and shoulder. She was able to feed herself and use the bathroom unassisted, but stated she needed help getting dressed due to the limited range of motion in her right shoulder and poor grip strength in her left hand. Furthermore, Plaintiff claimed she was unable to properly brush her hair because of this limited range of motion and poor grip strength. She stated the pain in her right shoulder and wrist causes her hand to become unsteady and she is

unable to properly bathe herself regularly due to the and because she becomes faint and dizzy (Tr. 1028).

Plaintiff stated she did not need any special reminders to take care of personal needs or grooming. She organized her medication so she would not forget to take it. Plaintiff claimed she was previously capable of preparing three meals a day at least four times a week, but her disability left her only capable of preparing sandwiches or frozen dinners. Her friends and family provide her son and herself with meals. Plaintiff stated she was able of doing the laundry, sweeping, and mopping, but her son assisted her in all three household chores. She alleged she was unable to do more house or yard work because she was unable to pick up items heavier than five pounds. In addition, Plaintiff claimed her heart would begin to race or she would begin to black out with extended physical activity. Plaintiff stated she only leaves the home once a week, but cannot drive herself and must travel with someone else because of the potential of an unexpected blackout. (Tr. 1030).

Plaintiff asserted she was able to pay bills and count change but could not handle a savings account or use a checkbook or money orders because she had "problems controlling funds, [does not] remember to pay bills, or [gets] confused on what bills should be paid" Plaintiff attributed her confusion and inability to remember to headaches caused by her shoulder and neck pains. (Tr. 1031).

Plaintiff asserted she was much more active before her disability, including playing sports with her children, swimming, walking, jogging, kickboxing, and cleaning the house. However, Plaintiff stated she is now capable only of watching television, solving word searches, and drawing with her son. Plaintiff claimed her family has made her feel useless to them because she is unable to be as active as she was previously. She is unable to be social or go places with friends since the onset of her disability. Plaintiff alleged her disability has affected her in lifting, reaching, talking, hearing, seeing, memory, completing tasks, concentration, understanding, using her hands, and getting along with others. (Tr. 1032).

Plaintiff further claimed she is only able to walk to her mailbox and back, and some days she is only able to walk from her recliner to the bathroom. She must rest twenty to thirty minutes before she can walk again. When asked how long she could pay attention, Plaintiff answered, "Seriously? It has taken a month to fill this out." Plaintiff listed the following medication and their side effects: Neurotin caused tiredness; Klonopin sometimes caused drowsiness; Hydrocodone caused nausea; and Flector patches caused stomach pains. (Tr. 1034).

On March 14, 2012, Plaintiff was admitted to Atlanta Memorial Hospital and discharged two days later. Plaintiff had a history of persistent gastritis symptoms, nausea, and vomiting and had been diagnosed on several prior occasions as positive for Helicobacter pylori. Dr. Swami noted Plaintiff had shoulder pain which was precipitating her chronic symptoms. Her pain was controlled with narcotics and her symptoms were comparatively better with food discretion. Plaintiff also had a history of chronic anxiety and depression, which was treated with Xanax, Paxil, and breathing exercises. Her blood pressure, electrolytes, white cell count, and iron were all within normal limits and well controlled. Plaintiff's abdomen and pelvis had multiple benign hepatic cysts, but were otherwise normal. Plaintiff was discharged from the hospital in stable condition. Dr. Swami diagnosed Plaintiff on discharge with acute chronic gastritis, Helicobacter pylori, dehydration, chronic anxiety, hypothyroidism, and chronic shoulder pain (Tr. 3224). Plaintiff's radiology diagnosis noted abdominal pain and gastrointestinal bleeding (Tr. 2235).

Plaintiff was admitted to Christus St. Michael Health System on April 12, 2012. She was seen by Dr. Patel who performed a physical examination and took an x-ray of her abdomen. Plaintiff's physical examination was normal; Dr. Patel noted Plaintiff grimaced during the abdomen exam, but there was no rebound tenderness, her stomach was soft, and her bowel sounds were active. There were no signs of acute joint inflammation. The x-ray of Plaintiff's abdomen suggested possible mild ileus versus enteritis, but her basic metabolic panel was normal and the gallbladder ultrasound was negative. Dr. Patel noted Plaintiff's nausea, vomiting, diarrhea, and abdominal pain appeared to be "out of proportion to the findings" (Tr. 2419).

Plaintiff visited Dr. Schuyler on May 31, 2012 after being referred by the Texas Disability Determination Services for a clinical interview with mental status exam, and an assessment of adaptive functioning. Plaintiff's chief complaints were depression and a history of physical health issues. She had no prior or current substance abuse. Dr. Schuyler noted Plaintiff's ability to complete tasks remained intact, she could deal with a reasonable amount of routine stress, and there was no history of Plaintiff's mental health issues adversely impacting her occupational functioning. (Tr. 2578).

Plaintiff stated she grew up witnessing her stepfather physically abusing her mother. She previously suffered from situational depression after her son was sexually assaulted. She could manage basic self-care needs, but she also alleged she becomes worn out easily. She requires assistance from her son with all household chores and her husband does the grocery shopping. However, Plaintiff stated her relationship with her husband is strained because he is not supportive of her physical or mental health problems and they do not communicate. She possesses good budgeting skills but her husband manages the family finances. She has no personal source of income and her husband supports the family. Plaintiff stated she has two close friends and is also close to her mother; but she is no longer able to go out socially on a regular basis like she had been before the onset of disability. (Tr. 2579).

Dr. Schuyler noted Plaintiff had good eye contact, good ability to relate information in a concise manner with clear thought processes, and no indication of perceptual abnormalities. Plaintiff's mood was dysphoric (i.e. uneasy or dissatisfied) and Dr. Schuyler noted she seemed irritable (Tr. 2579-2580). She was oriented to person, place, time, and situation and could recall seven digits forward and four digits backwards immediately. She knew her date of birth, address and telephone number and stated President Bush and President Carter were recent presidents. Plaintiff was able to adequately name a current event, but when asked to name five large cities, she replied "New York, Chicago, California, Virginia, North Carolina" (Tr. 2580). Plaintiff displayed adequate calculation, abstract thinking, and judgment and Dr. Schuyler estimated her IQ to be in the average

range. Dr. Schuyler diagnosed Plaintiff with chronic adjustment disorder with mixed anxiety and depressed mood. He assessed her current Global Assessment of Functioning (GAF) as a sixty and her highest GAF Past Year as a seventy. She was capable of managing personal finances. Dr. Schuyler's prognosis of Plaintiff was good, stating, "While this patient may or may not suffer somatic problems that impede or preclude occupational functioning, from a psychological perspective, she appears to maintain the ability to reason, and make personal, social, and occupational adjustments" (Tr. 2581).

Plaintiff was admitted to Christus St. Michael Health System on June 19, 2012 and was discharged on June 25, 2012. Plaintiff's diagnoses on admittance were: acute recurrent irritable bowel syndrome/spastic colon; acute on chronic gastroparesis secondary to irritable bowel syndrome (IBS); acute on chronic pain syndrome; hematochezia; migraine headaches; paroxysmal atrial fibrillation; normocytic normochromic anemia; and a history of Helicobacter pylori and Clostridium difficile. (Tr. 2715). On discharge, her diagnoses were: severe irritable bowel syndrome with constipation component; migraine headaches (improved); acute on chronic pain syndrome (stable); normocytic normochromic anemia (stable); a history of Helicobacter pylori and Clostridium difficile colitis; polypharmacy; and uterine complex cyst per pelvic ultrasound (Tr. 2715). Plaintiff had previously undergone upper endoscopies and colonoscopies with biopsies of the esophagus, stomach, and colon; these all proved all normal except for a finding of chronic gastritis. Plaintiff's stool cultures showed no pathogens, ova or parasites. She also had various other tests including a liver scan and a ventilation/perfusion scan, which were all within normal limits and unremarkable. Plaintiff was hemodynamically stable with mild intermittent abdominal cramping on discharge, but no fevers, chills, or active emesis (Tr. 2716).

On January 8, 2013 Plaintiff went to Dr. Todd Williams for a physical assessment and to discuss a cyst within her jaw. Dr. Williams found Plaintiff's cyst was an odontogenic keratocyst of her mandible, but her dental health was otherwise normal. Dr. Williams found Plaintiff's physical examination to be largely normal, noting she could move all of her extremities well with a full range

of motion. Dr. Williams scheduled Plaintiff for a right total temporal mandibular joint (TMJ) replacement on January 11, 2013 (Tr. 3128-29).

On January 17, 2013, Dr. Dan Nichols, Plaintiff's treating physician, wrote an email detailing his experience with Plaintiff. Dr. Nichols noted Plaintiff had been his patient for many years for back problems and back pain along with general anxiety disorder. He stated Plaintiff was on multiple medications for several years but did stop all medication at one time. However, she returned to using her medications after a year's time when she fell and broke both of her arms. Dr. Nichols stated Plaintiff had a diagnosis of generalized anxiety disorder and atypical bipolar disorder She had recently undergone a hysterectomy which caused her to develop atrial fibrillation requiring cardiac evaluation, but there was no reoccurrence. Dr. Nichols stated Plaintiff sees a cardiologist in Little Rock and another physician, Dr. Syed, for pain management of her back pain. Plaintiff was also prescribed Prozac for her generalized anxiety disorder, which she stated was helpful. Plaintiff recently had oral surgery but Dr. Nichols did not have any records relating to this problem. Dr. Nichols also mentioned Plaintiff's numerous admissions into Christus St. Michael Hospital for vomiting, dehydration, and diarrhea in the last few months and her diagnosis of irritable bowel syndrome. In conclusion, Dr. Nichols stated he felt Plaintiff was unable to obtain any gainful employment due to her physical and psychological problems (Tr. 2990-91).

Plaintiff was again admitted to Christus St. Michael Hospital on January 27, 2013 for persistent vomiting, dehydration, and loose bowel movements. Plaintiff was not responding well to outpatient therapy for her vomiting (Tr. 3143). Plaintiff was treated with IV fluid therapy and her overall condition was significantly improved after the medication Reglan was added. After three days, Plaintiff's condition was markedly improved and she was discharged with instructions to maintain a bland diet over the following forty-eight hours (Tr. 3143).

## THE HEARING

At the video hearing held on March 1, 2013, Plaintiff's attorney amended the application date from May 8, 2010 to September 1, 2011, the same as the protective filing date of SSI (Tr. 891, Tr. 899). Plaintiff stated she was born April 8, 1969, making her 42 years old when she filed for disability. Plaintiff testified she was separated from her husband but they reside in the same household with their eleven year old son. She has a driver's license and would drive to pick up medication or when shopping for necessities. Plaintiff does not have a high school education and did not complete the eleventh grade. She does not have any vocational training or trade schooling (Tr. 894).

Plaintiff stated she was not employed and had not held gainful employment since September 1, 2011, nor had she applied for any job. Her last employment was outside sales for a telephone company in 2006. While the ALJ believed she wrote secretary in her application paperwork, Plaintiff stated she only did outside sales. Plaintiff described this job, stating she would attend a meeting every morning and then go out to customer's homes to assess their bills, upgrade their internet, upgrade their phone service, and try to sell satellite service for television (Tr. 896).

Plaintiff stated she was not currently receiving any benefits from local, state or the federal government. She alleged disability due to degenerative disc disease in her lower back, arthrofibrosis of the right shoulder, neck pain, carpel tunnel, left wrist with plate and screws, depression, anxiety, and panic attacks (Tr. 896).

Plaintiff testified the main issues preventing her from work included the medication she had to take and fear of passing out. Plaintiff also alleged she was suffering from abdominal pain, gastritis, nausea, and vomiting, but none of these were caused by her medications. However, her medication caused drowsiness and blurred vision, causing her to have to lay down and rest every day. Plaintiff also testified she was given a Flector patch on her left wrist because she was unable to take certain oral medication due to her stomach problems (Tr. 898-899).

Plaintiff wears the Flector patch underneath a brace on her left wrist because of her carpel tunnel syndrome. She had a plate and screws inserted into her left wrist and arm in surgery after being thrown from the horse. She stated she still has no sensation in her thumb and she is unable to grasp or hold many objects, such as a cup of coffee (Tr. 900).

Plaintiff complained she also suffers from carpel tunnel syndrome in her left hand and arm which she cannot treat properly because of the plate and screws. This resulted in a lot of pain, particularly in cold or rainy weather. Plaintiff testified she has a wrap to keep her hand warm but she still suffers from numbness and a lack of rotation in her wrist (Tr. 901).

Plaintiff also claimed she dislocated her right shoulder and has several fractures in this shoulder. These injuries have prevented her from having a full range of motion in her shoulder and render her unable to lift her right arm and shoulder above her head. Plaintiff claimed she is unable to lift or hold anything "more than your average purse," or approximately five pounds (Tr. 902).

In addition to these physical impairments, Plaintiff testified she was diagnosed with a spastic colon and irritable bowel syndrome. She takes medication for diarrhea and cramping, but she still must take a bathroom break four to six times within an hour after eating despite her medication. Plaintiff stated she must still take unscheduled bathroom breaks during a work day even with prior planning and preparation (Tr. 903).

Plaintiff also stated she has been on medication since she was twelve years old for atrial fibrillation. Her medication does not always help with her heart problems and she was in the ICU in August of 2012 when her heart rate went to approximately 176 with an arrhythmia. The medication causes her blood pressure to become too low and she must check it several times a day. If it goes too low, she must take additional medication. This happens at least once a week. (Tr. 904).

According to Plaintiff, these impairments cause her to suffer from depression, anxiety, and panic attacks. She takes medication for these conditions but it does not completely keep her depression and anxiety under control. She is self-conscious of her impairments, and this self-consciousness affects her ability to socialize with others (Tr. 905).

Plaintiff also alleged multiple infections and cyst issues with her jaw which she has had to deal with over the years. Plaintiff stated she has a recurrent cyst which causes her to become dehydrated. She was on a soft food diet at the time of the hearing in order to prepare for her surgery, and it would take about three to four months to recover. (Tr. 906).

Plaintiff was still able to do the laundry for her household, but could not cook except with a microwave. Furthermore, her son must sweep, mop, and vacuum the house because she could not. Plaintiff is not involved in any activities outside of her household, but mostly sleeps or lies down. She stated she is going to the doctor more than anything (Tr. 908).

The ALJ began his examination by stating Plaintiff had reported earlier she was living independently with two children, was in a relationship, had friends, attended church, was able to do routine household chores, and handle her personal hygiene. He also noted Plaintiff earlier stated she went to Walmart for necessities but later claimed she was unable to go shopping. In response, Plaintiff explained she was unable to carry heavy groceries to her car or into the household. While there was a lack of medical records for her carpel tunnel syndrome compared to her other medical records, Plaintiff stated she was unable to continue having surgery on her arms because she could not afford it. (Tr. 909).

The vocational expert described Plaintiff's previous employment as an outside sales person as being semi-skilled, SVP 4, and light in exertional requirements. The ALJ then posed a hypothetical question about whether a person who was the Plaintiff's age, with a limited education of tenth grade, with the past work experience the Vocational Expert just described, and who was capable of the full range of light work, could perform the Plaintiff's past relevant work. The

vocational expert answered if the person was capable of a full range of light work, then the person would be capable of performing work as an outside sales person. (Tr. 911).

Plaintiff's counsel asked the vocational expert to hypothetically accept the Plaintiff's testimony and assume she would need fifteen minutes of every hour for an unscheduled break. Plaintiff's attorney asked what impact or affect this would have on Plaintiff's ability to maintain employment as an outside sales person or any other employment. The vocational expert responded the amount of breaks suggesting, amounting to roughly twenty five percent of the work days, was too excessive and would preclude someone from maintaining competitive employment (Tr. 912).

Plaintiff's counsel furthered the hypothetical and asked if these conditions were causing absenteeism two or more days of the month on a continuing basis, how would these conditions affect a job as an outside sales person or any other work. The Vocational Expert stated it would have the same impact, and it would be impossible to maintain competitive employment. (Tr. 912-913).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since September 1, 2011, the application date and amended alleged onset date.

2. Plaintiff had the following severe impairments: lumbar degenerative disc disease, irritable bowel syndrome, and chronic anemia.

3. Plaintiff does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work.

5. The claimant is capable of performing past relevant work as an outside sales, light, SVP4 DOT #270.357-034. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

6. The claimant has not been under a disability, as defined in the Social Security Act, since September 1, 2011, the date the application was filed.

<u>STANDARD OF REVIEW</u>

In an appeal under § 405(g), this Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). This Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995), and conflicts in the evidence are resolved by the Commissioner, *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).

The legal standard for determining disability under Titles II and XVI of the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see also Cook*, 750 F.2d at 393. In determining a claimant's capability to perform "substantial gainful activity," a five-step "sequential evaluation" is used, as described below. 20 C.F.R. § 404.1520(a)(4).

<u>SEQUENTIAL EVALUATION PROCESS</u>

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations establishing a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520(a) `(2011). First, a claimant who, at the time of his disability claim, is engaged in substantial gainful employment is not disabled. 20 C.F.R. § 404.1520(b) (2011). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(c) (2011). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1 (2011). 20 C.F.R. § 404.1520(d) (2011). Fourth, a claimant with a severe impairment which does not correspond to a listed impairment is not considered disabled if he is capable of performing his past

work. 20 C.F.R. § 404.1520(e) (2011). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(f) (2011).

ANALYSIS

Plaintiff raises the following issues on appeal: (1) the ALJ failed to properly assess Plaintiff's irritable bowel syndrome, inflammatory bowel disease, gastritis, gastrointestinal bleeds, and hemorrhage of the gastrointestinal tract in accordance with Listing 5.06; (2) the ALJ failed to consider the combination of Plaintiff's impairments as a whole, isolating each impairment; and (3) the ALJ erred in assessing Plaintiff's RFC without giving weight to the treating physician's opinion and the combination of Plaintiff's impairments as a whole, and therefore the decision is not supported by substantial evidence.

## 1. Assessment of Gastrointestinal Symptoms

Plaintiff first argues the ALJ erred at Step Three of the sequential evaluation by failing to find she meets the criteria of a listing. The Supreme Court has explained as follows:

> The listings set out at 20 C.F.R. part 404, subpart P, appendix 1 are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.

*Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

The specified medical criteria are designed to be demanding and stringent because they lead to a presumption of disability, making further inquiry unnecessary. *Id.* at 532; *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). The claimant has the burden of proving her impairments meet or equal the criteria of the Listings. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). If the claimant fails to meet this burden, the court will find substantial evidence supports the ALJ's finding. *Henson v. Barnhart*, 373 F.Supp.2d 674, 685 (E.D.Tex. 2005), *citing Selders*, 914 F.2d at 620. In order to meet the listing requirements, all of the listing criteria, including any diagnostic

description in the listing's introductory paragraph, must be satisfied. *Zebley*, 493 U.S. at 530; *Randall v. Astrue*, 570 F.3d 651, 659 (5th Cir. 2009). An impairment meeting only some of the criteria, no matter how severely, does not qualify, and an impairment cannot meet a listing based only on a diagnosis. 20 C.F.R. §404.1525(d).

Plaintiff argues her condition meets the criteria of Listing 5.06. This listing covers:

Inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with:

A.    Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6–month period;

OR

B.    Two of the following despite continuing treatment as prescribed and occurring within the same consecutive 6–month period:

    1.    Anemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart; or

    2.    Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60 days apart; or

    3.    Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

    4.    Perineal disease with a draining abscess or fistula, with pain that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

    5.    Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart; or

    6.    Need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter.

20 C.F.R. pt. 404, subpart P, app. 1, §5.06; *see Singleton v. Colvin*, civil action no. 3:12cv821, 2013 WL 1562867 (N.D.Tex., April 15, 2013).

Plaintiff sets out the requirements of Listing 5.06 and states she has been admitted to the hospital numerous times for chronic diarrhea and intractable vomiting. Dr. Nichols observed multiple problems including chronic anxiety disorder, IBS, atrial fibrillation, severe back pain, depression, and severe cyst formation in her right mandible. When admitted to the hospital on June 19, 2012, she was diagnosed with acute recurrent IBS, acute on chronic gastroparesis secondary to IBS, acute on chronic pain syndrome, hematochezia (bright red blood in the stool), migraine headaches, paroxysmal atrial fibrillation, normocytic normochromic anemia, and a history of H.pylori and clostridium diificile. Her discharge diagnoses included IBS, migraine headaches (improved), acute on chronic pain syndrome (stable), normocytic normochromic anemia (stable), a history of H.pylori and clostridium diificile, and polypharmacy.

Although Plaintiff discusses her diagnoses at length, she has not met her burden of proof to show she meets all of the criteria of Listing 5.06. She does not show she suffered obstruction of the stenotic areas of the small intestine or the colon requiring hospitalization for intestinal decompression or for surgery, as required by Listing 5.06(A), nor does she identify which two of the six criteria of Listing 5.06(B) she claims to have met during the relevant time period, much less present medical evidence to support such an assertion.

Dr, Nichols' letter, cited in Plaintiff's brief, does not show Plaintiff meets all the criteria of Listing 5.06. The medical records dated after the ALJ's February 6, 2013 decision do not meet the criteria of the Listing at all, much less show she met these criteria during the relevant period. *See Ferrari v. Astrue*, 435 F.App'x 314, 2010 WL 7114189 (5th Cir., June 3, 2010), *citing Haywood v. Sullivan*, 888 F.2d 1463, 1471-72 (5th Cir. 1989) (to be material, new evidence must relate to the time period for which benefits were denied and not concern evidence of the subsequent deterioration of a previously non-disabling condition). Nor does Plaintiff's testimony show she meets either subpart of Listing 5.06. She has failed to meet her burden of proof at Step Three of the sequential evaluation process.

Plaintiff further asserts the ALJ ignored many records showing her ongoing problems with IBS and failed to offer a sufficient reason for discrediting the opinion of Dr. Nichols, the treating physician. Instead, Plaintiff states the ALJ simply held Dr. Nichols' opinion was afforded little weight because the issue of disability is reserved to the Commissioner and Dr. Nichols "admitted that some of the claimant's conditions was [sic] either helped with medication or was not a common occurrence." (Tr. 880). Plaintiff argues this is not a sufficient reason for discrediting Dr. Nichols' opinion, contending the ALJ failed to cite *Stone* or apply the correct standard of severity.

While Plaintiff claims the ALJ failed to cite *Stone*, this is incorrect. The ALJ referred to the *Stone* standard on page 3 of the opinion (Tr. 873) and later stated "all impairments have been considered under the standard set forth in *Stone*" (Tr. 877). Plaintiff has not shown the ALJ applied an incorrect standard of severity. Her first ground for relief is without merit.

## 2. Failure to Consider Impairments as a Whole

Plaintiff asserts she became disabled on September 1, 2011, as a result of a number of severe impairments, but the ALJ found only three: lumbar degenerative disc disease, irritable bowel syndrome, and chronic anemia. The ALJ considered some of her physical impairments being non-severe and concluded her mental impairments were mild and therefore also not severe. Plaintiff received two psychological evaluations at the request of DDS and also saw Dr. Rafael Otero for complaints of depression, anxiety, and panic attacks. Plaintiff acknowledges she is not disabled solely because of her mental impairments but argues her medical condition as a whole contributes to her mental deterioration.

Plaintiff states the ALJ found her atrial fibrillation, migraines, hypotention, right shoulder fracture, left wrist fracture, carpal tunnel syndrome, and irritable bowel syndrome were not severe. She had right mandible joint replacement surgery two days after the hearing and these records were furnished to the ALJ. Plaintiff further alleges she suffered side effects of her medication related to irritable bowel syndrome and chronic pain. She testified at the hearing the medication blurred her vision and caused drowsiness.

Although Plaintiff maintains the ALJ found her irritable bowel syndrome not severe, the ALJ plainly held this condition amounted to a severe impairment. (Tr. 873). Plaintiff next states the ALJ concluded her right shoulder fracture, left wrist fracture, and carpal tunnel syndrome were not severe because they had healed, but maintains this is incorrect.

The ALJ determined Plaintiff suffered a right shoulder fracture in May of 2010 after falling off a horse. She went to the emergency room in July with a complaint of right shoulder pain, apparently aggravated by an altercation with her husband. She had limited range of motion with pain on movement and X-rays showed evidence of prior fracture. She reported stiffness in her shoulder in October of 2010, but had active and passive range of motion at 90 degrees forward flexion and 90 degrees abduction. X-rays showed a healed fracture with some calcification. Based on this evidence, the ALJ determined this injury was not severe.

The ALJ found Plaintiff fractured her wrist in her horseback riding accident and underwent an open reduction and internal fixation. She complained of left wrist discomfort in October of 2010 but was able to make a fist. Her wrist had slight tenderness but no palpation. In March of 2011, her left hand had normal range of motion. The next month, she again complained of discomfort and showed positive Tinel and Phalen's signs. Her X-rays were normal but the doctor ordered a nerve conduction study, and by December of 2011, she had developed carpal tunnel syndrome secondary to the left wrist injury. However, she has normal range of motion in her hand, she can make a fist, and she has normal grip strength. Her wrist fracture has healed. The ALJ determined this injury and the carpal tunnel syndrome were not severe.

Plaintiff argues the records do not support the ALJ's findings, pointing to notes from treating physician Dr. Chris Alkire stating her right shoulder still bothers her and would eventually require manipulation under anesthesia, there is significant arthrofibrosis of the right shoulder, she can make a fist but has positive Tinel's and a positive Phalen's, and she has pain with forward flexion and internal rotation.

The ALJ's decision reviewed medical evidence showing Plaintiff had relatively normal results concerning her wrist and shoulder, including determinations she had active and passive range of motion at 90 degrees forward flexion and 90 degrees abduction. She was able to make a fist and had normal grip strength in her left hand. Dr. Alkire noted Plaintiff stated she could make a fist and her left wrist was doing okay and was usable. To the extent Dr. Alkire's findings conflict in some way with the evidence cited by the ALJ, or some other records tend to indicate a greater degree of loss of function than the ALJ found, the Fifth Circuit has held conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence supports the ALJ's conclusions in this regard.

Plaintiff next refers to the surgery she had on her jaw. Even aside from the fact this surgery took place after the hearing and thus was not before the ALJ, Plaintiff has offered nothing suggesting her jaw surgery or the condition which required this surgery imposed such limitations to as to amount to a severe impairment or that such impairment could be expected to last for 12 months.

Plaintiff testified as to side effects from her medication, stating these cause drowsiness and blurred vision, but points to no objective evidence in the record to show these side effects create additional functional limitations. Her application for disability benefits did not allege disability based on medication side effects (Tr. 1000).

Nor has Plaintiff shown the ALJ improperly failed to consider the combination of impairments created by her mental condition, right shoulder, left wrist, carpal tunnel, jaw surgery, and medication side effects. In making a determination as to disability, the ALJ must analyze both the disabling effect of each of the claimant's ailments and the combined effect of all of these impairments. *Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987).

The ALJ's opinion recognized the Commissioner's obligation to consider the claimant's severe and non-severe impairments in combination. In discussing the sequential evaluation process, the ALJ stated "at step two, the undersigned must determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.'" At Step

Three, the ALJ is required to determine whether the claimant's impairments or combination of impairments is severe enough to meet or medically equal the criteria of a listing. (Tr. 872).

The ALJ further stated before considering Step Four, the claimant's residual functional capacity must be determined. The residual functional capacity is the claimant's ability to perform physical and mental work activities on a sustained basis despite limitations from her impairments; in making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe. (Tr. 872).

The ALJ discussed Plaintiff's mental limitations, her history of migraine headaches, a period of time in which she was dependent upon pain medication, the injuries to her shoulder and wrist, her positive test for signs of carpal tunnel syndrome, and her episodes of atrial fibrillation, irregular menses, and hypotension. The ALJ stated "all impairments have been considered under the standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985)" and concluded "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1." (Tr. 877).

Plaintiff has not met her burden of showing the ALJ failed to consider her impairments in combination. In *Roberson v. Astrue*, 471 F.App'x 314, 2012 WL 1994476 (5th Cir., Jnue 1, 2012), the petitioner complained the ALJ overestimated her residual functional capacity and failed to consider her impairments in combination. The Fifth Circuit stated "the ALJ's decision reflects that she did consider Ms. Roberson's impairments in combination. The decision references 'impairments' in several places. It also includes a thorough discussion of Ms. Roberson's medical history and the symptoms of both her back and vision problems." *Id.* at *1.

Similarly, the ALJ here discussed Plaintiff's medical history at some length and stated all impairments have been considered under the standard set forth in *Stone v. Heckler*. The Fifth Circuit has held a specific statement from the ALJ showing the ALJ has considered the impairments singly or in combination is sufficient to affirm the ALJ's decision when a review of the evidence shows substantial evidence to support the ALJ's decision. *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir.

1985). As in *Owens*, the ALJ determined Plaintiff's impairments, singly or in combination, did not meet or medically equal the severity of one of the listed impairments. This determination is supported by substantial evidence.

Plaintiff argues the ALJ must follow the Social Security Regulation guidelines to determine whether controlling weight should be given to the medical opinions of a treating source. Under these guidelines, the opinion must come from a treating source, the opinion must be a medical opinion, the opinion must be well supported by medically acceptable clinical and laboratory techniques, and the opinion must not be inconsistent with other substantial evidence. Plaintiff acknowledges the ALJ is free to reject the opinion of a physician when the evidence supports a contrary conclusion, but states treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527 and 416.927.

If medical evidence supports a treating physician's opinion about the existence of a disability, Plaintiff argues this opinion is binding on the fact finder unless contradicted by substantial evidence to the contrary. In this case, Plaintiff states her treating physician, Dr. Nichols, found her disabled. She asserts Dr. Nichols' assessment included objective findings and addressed her exertional and non-exertional impairments. In her brief, Plaintiff quotes Dr. Nichols' summary of her ailments, highlighting the doctor's statement "I do feel that this patient is unable to obtain any gainful employment due to her multiple problems, both physical and psychological," and asserts the treating physician's opinion was entitled to controlling weight.

Although Dr. Nichols was a treating physician, his belief Plaintiff could not obtain gainful employment was not a medical opinion but rather an opinion on an issue reserved to the Commissioner. 20 C.F.R. §404.1527(d) states medical source opinions on issues reserved to the Commissioner, including an opinion as to whether a claimant is disabled, receive no special significance. The statute provides "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." As such, Dr. Nichols'

statement Plaintiff would be unable to obtain gainful employment receives no special significance. Plaintiff's assertion this opinion is entitled to controlling weight is without merit.

### 3. Error in the Residual Functional Capacity Assessment

Plaintiff contends residual functional capacity is defined wholly in terms of the physical ability to perform certain tasks. If a claimant has a non-exertional impairment, the Medical-Vocational Guidelines and grid are not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence such as vocational testimony. An ALJ may rely exclusively on the Medical-Vocational Guidelines even where a claimant has non-exertional impairments if the ALJ concludes the non-exertional impairments do not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines.

Plaintiff states in other words, the Guidelines may direct a conclusion of disabled or not disabled if the ALJ determines the claimant's non-exertional limitations do not significantly affect the RFC. In her case, she states her non-exertional limitations do significantly affect her RFC. The ALJ did not rely solely on the Medical-Vocational Guidelines, but obtained evidence from a vocational expert. *See Fraga*, 810 F.2d at 1304 (if claimant has only exertional impairments or non-exertional impairments which do not significantly affect his RFC, the ALJ may rely exclusively on the Medical-Vocational Guidelines to determine whether there is other work the claimant may perform; otherwise, the ALJ must rely on expert vocational testimony or other similar evidence to establish the existence of such jobs).

Plaintiff argues Dr. Nichols' assessment supports her claim of disability, but the ALJ found her capable of performing the full range of light work. She states the ALJ knew she had limited range of motion in her right arm, muscle spasms and tenderness in her right shoulder, right rotator cuff syndrome, and positive Tinel's and Phalen's signs in her left wrist. Plaintiff testified she cannot lift with her left hand, has no feeling in her left thumb, lacks full rotation in her right arm, and cannot lift her right arm because of her limited mobility. However, Plaintiff asserts the ALJ gave no consideration to these limitations in assessing her RFC or in questioning the vocational expert.

The ALJ's decision discussed Plaintiff's medical history, including her range of motion, muscle spasms, rotator cuff syndrome, positive Tinel's and Phalen's signs, and carpal tunnel syndrome. While Plaintiff testified as to her symptoms, the ALJ determined Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms was not entirely credible because the medical records did not provide a basis to support the level of severity alleged. The ALJ also cited Plaintiff's activities of daily living, including the fact she could tend to most of her grooming needs independently, she could drive short distances, prepare simple meals, perform light household chores, and shop. *See Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995). The ALJ thus considered all of the functional limitations which he found supported by the evidence.

Similarly, Plaintiff complains the ALJ's hypothetical questions to the vocational expert did not include all of the limitations she claimed. She notes Dr. Otero stated "she began to experience symptoms of depression and anxiety. She reports that she currently cannot sleep over four hours per night, is having crying spells, is constantly tired, has considerable free-floating anxiety and worries about her future." (Tr. 2578). The quoted statement is not a medical opinion or a diagnostic impression but a recounting of Plaintiff's subjective complaints as told to the doctor.

A hypothetical question posed by the ALJ need incorporate only those claimed disabilities supported by the evidence and recognized by the ALJ. *Masterson v. Barnhart*, 309 F.3d 267, 274 (5th Cir. 2002). The hypothetical questions posed by the ALJ met this standard and the Plaintiff has failed to show the ALJ erred by not incorporating other limitations into these questions. Her third ground for relief is without merit.

<u>CONCLUSION</u>

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Legget v. Chater*, 67 F.3d 558, 565-66 (5th Cir. 1995). Having reviewed the record, this Court finds the record demonstrates the

Administration correctly applied the applicable legal standards and that substantial evidence supports the Administration's determination that Plaintiff is not disabled. Accordingly, it is

**ORDERED** the above-entitled Social Security action is **AFFIRMED** and this civil action is **DISMISSED WITH PREJUDICE.**

**SIGNED this 5th day of October, 2015.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE